IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 118-021 |
| | ) | |
| JOSE DOMINGUEZ | ) | |
| MARIA ELENA ABONZO | ) | |

_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Defendants move to suppress distribution amounts of heroin and cocaine found in their minivan during a traffic stop in Columbia County on March 6, 2018, arguing officers did not have reasonable suspicion of drug possession or a window tint violation. (Doc. nos. 64, 65.) The Court finds the officers had reasonable suspicion as to both and **REPORTS** and **RECOMMENDS** Defendants' motions to suppress be **DENIED**.

**I.     FACTS**

    **A.     Traffic Stop and Vehicle Search**

Sergeant Michael Williamson works in the Vice and Narcotics Division of the Columbia County Sheriff's Office ("CCSO"). (Court's recording system, *For the Record* (hereinafter "FTR") 2:36:25 – 2:37:10.) On March 6, 2018, DEA Agent Jeremy Youngblood called Sgt. Williamson and explained Atlanta agents were tracking a 2008 Honda Odyssey carrying two kilograms of cocaine eastbound on Interstate 20 toward Columbia County. (FTR 2:37:51 – 2:38:24.) Sgt. Williamson and Agent Youngblood's relationship dated ten years back to their service together at CCSO, and Sgt. Williamson trusted Agent Youngblood

as a "very reliable source."  (FTR 2:37:10 – 2:37:39; 2:46:12 – 2:46:29.)

Agent Youngblood instructed Sgt. Williamson to call an Atlanta agent named D.J. (FTR 2:38:31 – 2:38:55.)  Agent D.J. informed Sgt. Williamson a 2008 Honda Odyssey with dark window tint was carrying two kilograms of cocaine eastbound on Interstate 20 toward Columbia County, en route from Atlanta to Columbia, South Carolina.  (FTR 2:39:03 – 2:39:24; 2:52:06 – 2:52:12.)  Agent D.J. provided the VIN, tag number, and NCIC printout, and described the occupants as one Hispanic male and one Hispanic female.  (FTR 2:40:08 – 2:40:23 ; 2:40:41 – 2:40:46.)  Agent D.J. explained he knew the van contained narcotics because he witnessed the transaction in Atlanta.  (FTR 2:40:56 – 2:41:04; 2:54:22 – 2:54:33.)

Sgt. Williamson relayed this information to CCSO colleagues, including Deputies Ryan King and Michael Santana, and instructed them to establish surveillance checkpoints on Interstate 20.  (FTR 2:41:08 – 2:41:22; 2:41:27 – 2:42:08.)  Deputy King observed the van traveling eastbound on Interstate 20.  (FTR 1:44:46 – 1:45:33.)  Trailing the van in separate patrol cars, Deputies King and Santana did not observe any moving traffic violations but Deputy King observed the window tint "looked pretty dark" and initiated a traffic stop based on a suspected window tint violation.  (FTR 1:45:55 – 1:46:41.)  The window tint also looked too dark to Deputy Santana.  (FTR 2:19:51 – 2:19:57.)

While Deputy King obtained identification from Defendants, Deputy Santana's K-9 Ares performed a free-air sniff of the van and alerted for the presence of narcotics.  (FTR 2:21:47 – 2:24:04.)  After removing two door panels and seats, officers located two traps, one of which contained approximately five kilograms of cocaine and two kilograms of heroin.  (FTR 1:52:13 – 1:56:36.)  At the scene, Sgt. Williamson corroborated the information supplied by Agents Youngblood and D.J. regarding the color, make, model, year, and tag number of the vehicle

and the ethnicity and sex of the occupants.  (FTR 2:43:11 – 2:45:05.)

### B. Window Tint

O.C.G.A. § 40-8-73.1 provides in pertinent part as follows:

(b)   Except as provided in this Code section, it shall be unlawful for any person to operate a motor vehicle in this state:
. . .
   (2)   Which has material and glazing applied or affixed to the rear windshield or the side or door windows, which material and glazing when so applied or affixed reduce light transmission through the windshield or window to less than 32 percent, plus or minus 3 percent, or increase light reflectance to more than 20 percent.

(c)   The provisions of subsection (b) of this Code section shall not apply to
. . .
   (6)   The rear windshield or the side or door windows, except those windows to the right and left of the driver of:
      (A)   A multipurpose passenger vehicle; . . . or
      (D)   Any other vehicle, the windows or windshields of which have been tinted or darkened before factory delivery or permitted by federal law or regulation . . . .

This code section prohibits window tint with less than thirty-two percent light transmission, except for windows located behind the driver that are either (1) tinted at the factory; or (2) installed aftermarket on a multipurpose passenger vehicle.  "Multipurpose passenger vehicle" means "a motor vehicle designed to carry ten persons or less which is constructed on a truck chassis or with special features for occasional off-road operation."  O.C.G.A. § 40-8-73.1(a)(5).

It is undisputed Defendants' van falls within the first exception because the tint was factory installed to windows located behind the driver, thus rendering irrelevant the statutory

3

standard of no less than thirty-two percent light transmission. Because the van's tint only allows twenty-two percent light transmission, aftermarket tint would have been illegal unless the van qualified as a multipurpose passenger vehicle. (FTR 2:25:23 – 2:25:51.) Defendants contend there was no reasonable suspicion for a traffic stop because it should have been obvious during Deputy King's initial approach the van qualified for both statutory exceptions because (1) the tint was factory installed; and (2) the van is a multipurpose passenger vehicle.

Deputies King and Santana were unaware of the exception for factory tint at the time of the traffic stop. (FTR 1:38:03 – 1:38:37; 2:00:31 – 2:01:30; 2:33:32 – 2:34:13.) Even if they had known, Deputy King explained the traffic stop would have been necessary to determine by inspection whether the tint was factory or aftermarket. (FTR 2:08:25 – 2:08:55.) Additionally, meters used to determine percentage light transmission require contact with the window. (FTR 1:38:37 – 1:39:21.)

Defendants presented expert testimony concerning the tint exception from professional window tint installer Christopher McGregor, who has performed thousands of installations during his fifteen-year career. (FTR 3:02:16 – 3:03:10.) A common pattern for factory tinted vehicles is clear windows in the front and tinted windows behind the driver, both side and rear. (FTR 3:04:29 – 3:05:00.) Aftermarket tint is a piece of plastic placed on the glass while factory tint is embedded in the glass. (FTR 3:08:38 – 3:08:59.) Factory tint always fits the full size of the window and does not have bubbling, scrapes, or scratches. (FTR 3:08:59 – 3:09:13.)

Mr. McGregor inspected the van and determined the tint was legal because the front windows were not tinted and the remaining windows were tinted at the factory. (FTR 3:05:56 – 3:07:08.) When Mr. McGregor entered the impound lot to inspect the van, the tint appeared at first glance to be factory. (FTR 3:14:53 – 3:14:58.) To know with certainty, however, Mr.

4

McGregor had to inspect the van by touching the windows and rolling them down. (FTR 3:09:52 – 3:10:26.) Mr. McGregor testified he must examine the vehicle up close in this manner to distinguish factory from aftermarket tint. (FTR 3:13:17 – 3:14:16.) Mr. McGregor did not observe any signs of aftermarket tint. (FTR 3:09:14 – 3:09:26.) Mr. McGregor acknowledged Honda makes vehicles with no tint on the windows, such that tint on the subject van could have been aftermarket even though it is, in fact, factory tint. (FTR 3:12:09 – 3:12:18.)

Andy Jones testified as a government witness regarding whether the minivan is a multipurpose passenger vehicle. A Honda dealer since 1974, Mr. Jones testified all Honda vehicles are built on a base floor pan and not on a truck chassis. (FTR 1:17:14 – 1:18:34.) Although Honda markets the Odyssey as a multipurpose passenger vehicle, it is not constructed for even occasional off-road operation and is not available with all-wheel drive. (FTR 1:18:55 – 1:20:33.) On some Odyssey models, Honda installs a standard tint pattern, which includes tint on the sliding door and back windows. (FTR 1:32:12 – 1:33:12.)

## II.   DISCUSSION

### A.   Deputy King Had Reasonable Suspicion of Drug Trafficking and a Window Tint Violation

Deputy King and CCSO had reasonable suspicion of drug trafficking based on the detailed information conveyed by Agents Youngblood and D.J., and Deputy King's corroboration of that information before he conducted the traffic stop. Deputy King and CCSO had reasonable suspicion of a window tint violation because the tint on Defendants' van allowed less light transmission than the general legal limit.

### 1. Reasonable Suspicion Standard

A police officer may, "in appropriate circumstances and in an appropriate manner, approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v. Ohio, 392 U.S. 1, 22 (1968).  Such a brief seizure and investigatory detention is appropriate where "(1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop was reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Jordan, 635 F.3d 1181, 1186 (11th Cir. 2011) (citation omitted).

"[R]easonable suspicion is a less demanding standard than probable cause," requiring a showing "considerably less than preponderance of the evidence," but there must be "at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000); see also United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (same).  A hunch will not suffice. Terry, 392 U.S. at 27.  Rather, an "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the investigative stop. Id. at 21.  The officer may then "briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993).

The Court must evaluate the "totality of the circumstances" to determine whether the investigators had a "particularized and objective basis" for suspecting legal wrongdoing. United States v. Arvizu, 534 U.S. 266, 273 (2002); see also United States v. Williams, 619 F.3d 1269, 1271 (11th Cir. 2010) (same).  Stated otherwise, reasonable suspicion "takes into account 'the totality of the circumstances – the whole picture.'" Navarette v. California, 572

U.S. 393, 397 (2014). Assessing the whole picture "does not deal with hard certainties, but with probabilities." United States v. Cortez, 449 U.S. 411, 418 (1981); see also United States v. Lewis, 674 F.3d 1298, 1304 (11th Cir. 2012). Reasonable suspicion "need not rule out the possibility of innocent conduct," but rather depends on a commonsense approach based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Navarette, 572 U.S. at 402 (internal quotations omitted). "Terry accepts the risk that officers may stop innocent people." Wardlow, 528 U.S. at 126.

"[S]ufficient probability, not certainty, is the touchstone" of Fourth Amendment reasonableness. Hill v. California, 401 U.S. 797, 804 (1971). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community protection.'" Heien v. North Carolina, 574 U.S. -,135 S. Ct. 530, 536 (2014) (citing Brinegar v. United States, 338 U.S. 160, 176 (1949)). Indeed, allowing an officer to briefly stop a person and ask questions based on reasonable suspicion "promotes the strong government interest in solving crimes and bringing offenders to justice." United States v. Hensley, 469 U.S. 221, 229 (1985). As the Supreme Court recognized,

> The Fourth Amendment does not require a policeman who lacks the precise level of information for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

Adams v. Williams, 407 U.S. 143, 145-46 (1972).

7

"An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively,* justify [the] action. The officer's subjective motivation is irrelevant." Brigham City v. Stuart, 547 U.S. 398, 404 (2006) (internal quotations and citations omitted); see also United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) (recognizing "the question . . . is not whether a specific arresting officer . . . actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search").

"Reasonable suspicion can be based on an officer's mistake of fact, so long as that mistake is reasonable." United States v. Longoria, 183 F. Supp. 3d 1164, 1169 (N.D. Fla. 2016) (citing Heien, 135 S. Ct. at 534). Additionally, "an officer conducts a valid traffic stop even if he makes an '*objectively* reasonable' mistake of law . . . ." United States v. McCullough, 851 F.3d 1194, 1201 (11th Cir. 2017) (citing Heien, 135 S. Ct. at 539).

### 2. The Detailed Information Conveyed by DEA to CCSO Formed a Solid Foundation for Reasonable Suspicion of Drug Trafficking

"Reasonable suspicion may be based on information supplied by another person, as long as the information bears sufficient indicia of reliability." United States v. McCall, 563 F. App'x 696, 700 (11th Cir. 2014) (citing Adams v. Williams, 407 U.S. 143, 146-47 (1972)). Rigorous scrutiny of the informant's basis of knowledge "may be unnecessary 'if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability.'" United States v. Williams, 177 F. App'x 914, 919 (11th Cir. 2006).

The DEA tip was sufficiently reliable to justify the traffic stop because the information conveyed to Sgt. Williamson came from inherently reliable DEA sources and

was sufficiently detailed and corroborated. As an agent trained by DEA to investigate drug offenses, Agent Youngblood certainly qualifies as the type of informant for whom rigorous scrutiny is unnecessary. Just as importantly, based on their ten-year relationship, Sgt. Williamson testified he knew Agent Youngblood to be an unquestionably honest and reliable person. Furthermore, the tip was sufficiently detailed and easily corroborated when, just as he predicted, a 2008 Honda Odyssey traveling eastbound on Interstate 20 drove through Columbia County on March 6, 2018. (FTR 2:37:51 – 2:38:24.)

Even more detailed was the information conveyed to Sgt. Williamson by Agent D.J., the DEA colleague Agent Youngblood instructed Sgt. Williamson to call. Because of Agent Youngblood's referral and D.J.'s status as an agent himself, rigorous scrutiny of the information provided by Agent D.J. is also unnecessary. Agent D.J. told Sgt. Williamson that, as a result of DEA's ongoing investigation in Atlanta, DEA knew a 2008 Honda Odyssey with dark window tint was carrying two kilograms of cocaine eastbound on Interstate 20 toward Columbia County, en route from Atlanta to Columbia, South Carolina. (FTR 2:39:03 – 2:39:24; 2:52:06 – 2:52:12.) Agent D.J. provided the VIN, tag number, and NCIC printout, and described the occupants as one Hispanic male and one Hispanic female. (FTR 2:40:08 – 2:40:23; 2:40:41 – 2:40:46.) This information proved to be true when later that same day, just as predicted, Deputy King spotted a minivan meeting this description traveling eastbound on Interstate 20 in Columbia County.

Defendants argue that, because Deputy King had no direct communication with Agents Youngblood and D.J., "the supposed window-tint violation was the only reason he had to stop the Honda Odyssey, thereby eliminating the government's purported justification of criminal activity." (Doc. no. 79, p. 2; doc. no. 80, p. 2.) The argument ignores reality.

9

Sgt. Williamson conveyed the DEA tip to Deputy King, and Deputy King arrived at Interstate 20 and trailed Defendants' van because of the information Defendants were transporting narcotics.  There is no legal requirement DEA speak directly with every member of the CCSO team.

Defendants also argue the traffic stop must be analyzed under the common knowledge doctrine instead of the framework for determining reliability of a tip.  (Doc. no. 79, p. 7; doc. no. 80, p. 7.)  They do so because a DEA report concerning surveillance of Defendants' van in Atlanta by Agent D.J.'s team suggests the agents did not witness a drug transaction, but instead merely saw the van enter and exit a subdivision.  The underlying premise for Defendants' argument is the mistaken belief the tip framework and collective knowledge doctrine are mutually exclusive.  There are at least five reasons why this is incorrect.

First, Defendants cite no precedent in support of this premise, and the Court could find none despite an exhaustive nationwide search.  Second, courts within the Eleventh Circuit often describe information conveyed by officers or agents from one law enforcement entity to officers or agents from a separate law enforcement entity as a tip.  See United States v. Harrelson, 465 F. App'x 866, 868 (11th Cir. 2012) (referring to information conveyed by Arcadia Police Department officer to DeSota County Sheriff's Office lieutenant as a "tip"); United States v. Taylor, 250 F. Supp. 3d 1215, 1221 (N.D. Ala. 2017) (referring to information received by FBI from foreign law enforcement agency as a "tip"); United States v. Wheeler, No. 1:15-CR-00390-MHC-JFK, 2017 WL 9472982, at *3 (N.D. Ga. June 12, 2017) (same).

Third, this treatment in our circuit of such information as a tip is consistent with the approach of courts nationwide.  See United States v. Benoit, 730 F.3d 280, 283-85 (3rd Cir.

10

2013) (applying tip framework to information provided to United States Coast Guard by Grenadian authorities about defendant); United States v. Mathurin, 561 F.3d 170, 175-76 (3rd. Cir. 2009) (applying tip framework to information conveyed to Immigration and Customs Enforcement from Department of Homeland Security Customs and Border Protection aircraft about suspicious vessel); United States v. Luong, 470 F.3d 898, 903-04 (9th Cir. 2006) (treating DEA tip to Monterey Park Police Department as anonymous for purpose of reliability where it included no predictive information); United States v. Glover, No. 11-290, 2012 WL 3548039, at *8 (E.D. La. Aug. 16, 2012) (finding reliable tip from DEA agents in Phoenix to DEA agents in New Orleans).

Fourth, not only are the collective knowledge doctrine and tip analysis not mutually exclusive, but the Court has serious doubts concerning whether the collective knowledge doctrine applies at all. As the Eleventh Circuit has repeatedly explained over several decades, the collective knowledge doctrine considers only the "'collective knowledge of the officers *involved in the stop*'" when determining if the totality of the circumstances establishes reasonable suspicion. United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004) (quoting United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989)) (emphasis added). Agents Youngblood and D.J. were not involved in the stop of Defendants' vehicle. Their involvement was limited to conveying the tip to Sgt. Williamson.

Fifth, support for the Court's conclusion can be found in the very decision Defendants cite for the proposition the Court must apply the collective knowledge doctrine and cannot apply the tip framework. In United States v. Winters, 491 F.3d 918, 921 (8th Cir. 2007), the Eighth Circuit applies both the tip framework and collective knowledge doctrine to uphold the traffic stop. In the context of analyzing the reliability of a tip given by a state law

enforcement officer to a state narcotics division, the court applied the tip framework and found the tip was sufficiently credible. In so doing, the court explained tips from anonymous citizens "are inherently less reliable than information provided by a sister law enforcement agency . . . ." Winters, 491 F.3d at 921. The court then analyzed the information possessed by the investigative group involved in the traffic stop under the collective knowledge doctrine. Id. at 921-922. Thus, Winters not only supports the position the doctrines are not mutually exclusive, but also the Court's application of the tip framework and the determination tips from law enforcement agents are inherently reliable. See also United States v. Dono, No. 10-763, 2011 WL 941465, at *3-5 (E.D. Pa. Mar. 17, 2011) (analyzing conveyance of information between officers under both tip framework and collective knowledge doctrine).

### 3. Reasonable Suspicion of a Tint Violation

Deputy King correctly observed while trailing Defendants that the van's rear windows appeared too dark to satisfy the thirty-two percent light transmission standard generally required by O.C.G.A. § 40-8-73.1(b)(2). He was correct. When he measured the tint during the traffic stop, the light transmission was twenty-two percent, a full ten percentage points below the Georgia minimum. (FTR 2:08:56 – 2:09:03.) While the van ultimately qualified for the factory tint exception, Defendants' own expert conceded one cannot determine whether this exception applies from a distance, such as while trailing the van on Interstate 20. Instead, one must conduct a close inspection to look for the subtle signs of aftermarket tint such as bubbling, scraping, and scratching. (FTR 3:10:47 – 3:11:39.) Deputy King thus had reasonable suspicion of a tint violation based on the specific and articulable fact he observed window tint that appeared to be, and in fact was, darker than the

general legal limit.

Defendants argue there was no reasonable suspicion because (1) the tint qualified for the factory tint and multipassenger vehicle exceptions to O.C.G.A. § 40-8-73.1; (2) Deputy King was not aware of either exception; and (3) Deputy King's observation of windows that appear to be too dark is a mere hunch that is too generalized to support a reasonable suspicion.  (Doc. no. 79, pp. 1-7; doc. no. 80, pp. 1-7.)  None of these arguments are persuasive.

First, the van does not qualify as a multipurpose passenger vehicle under O.C.G.A. § 40-8-73.1, which defines the term as "a motor vehicle designed to carry ten persons or less which is constructed on a truck chassis or with special features for occasional off-road operation."  O.C.G.A. § 40-8-73.1(a)(5).  Mr. Jones testified that, even though Honda marketing materials describe the Odyssey as a multipurpose passenger vehicle, it is not constructed on a truck chassis and is not constructed for even occasional off-road operation. (FTR 1:17:14 – 1:18:34; 1:18:55 – 1:20:33.)  The operative standard is the statutory definition, not whatever standard Honda applied when it decided to designate the van in marketing materials.  Mr. Jones' testimony leaves no doubt the van does not qualify under the statutory definition.

Second, it does not matter Deputy King was unaware of the factory tint exception, and to reach this conclusion one need not even consider the mistake of law doctrine.  Here, the objective facts did give rise to reasonable suspicion because (1) Deputy King observed window tint that was too dark to satisfy the general legal limit; and (2) the only way to discern whether the factory tint exception applied was to conduct a traffic stop.  Defendants cite many cases applying the mistake of law doctrine, but in all of them the objective facts

known to the officer at the time of the stop did not create reasonable suspicion of a legal violation. For example, in Heien, the officer knew before the traffic stop the defendant's car had only one working brake light but one is all North Carolina required. Heien, 135 S.Ct. at 540. In contrast, reasonable suspicion existed at inception of the traffic stop here, and only a close inspection during the traffic stop would have triggered the factory tint exception. See United States v. Moody, 240 F.App'x 858, 859 (11th Cir. 2007).

Third, Defendants argue Deputy King did not offer specific and articulable facts to support his observation the window tint was too dark, which they describe as a mere hunch. (Doc. no. 79, p. 5; doc. no. 80, p. 5.) However, personal observation of the window tint is sufficient to justify a traffic stop because reasonable suspicion hinges on that simple question of whether the tint appears too dark. United States v. Andrews, No. 3:17-cr-215-J-20MCR, 2018 WL 1786996, at *5 (M.D. Fla. Mar. 16, 2018) (upholding traffic stop for tint violation based on officer's training, experience, and personal observation of tint).

Notably, Deputy Santana also believed the windows were too dark, and Agent D.J. mentioned the darkness of the windows when conveying the tip to Sgt. Williamson. Furthermore, while information acquired after the traffic stop cannot serve as a basis for the traffic stop, Deputy King's observation proved to be accurate. The tint was indeed ten percentage points below the general legal limit. (FTR 2:25:23 – 2:25:51); see Andrews, 2018 WL 1786996, at *5 (noting officer's belief as to level of tint proved correct by later test); cf. Longoria, 183 F. Supp. 3d at 1175-77 (holding officer's mistake of fact unreasonable where tint was within legal limits).

Defendants argue Officer King's suspicion was not based on facts particular to Defendants' van because "75% of the driving public" has window tinting indistinguishable

14

from the van's tinting, and it was more likely than not the van qualified for the factory tint exception. (Doc. no. 79, p. 6; doc. no. 80, p. 6.) In support, they cite United States v. Heard, 725 F. App'x 743 (11th Cir. 2018), in which officers investigating a report of gunshots encountered the defendant near the scene. Id. at 749-54. The court determined nothing distinguished the defendant from any other person who might have been in the area, so there was no basis for objective, particularized suspicion the defendant may have been engaged in criminal activity. Id. at 752. In stark contrast, Deputy King based his reasonable suspicion on personal observation of Defendants' van. And even if Defendants are correct that seventy-five percent of vehicles have factory tint darker than thirty-two percent light transmission, mere prevalence cannot preclude Georgia officers from conducting a traffic stop to determine whether tint qualifies for the factory exception. The argument would, if accepted, eviscerate the ability of Georgia officers to enforce O.C.G.A. § 40-8-73.1.

Finally, the Court has considered the window tint decisions cited by Defendants and determined they do not require a different outcome. In United States v. Garcia, 284 F App'x 791, 793 (11th Cir. 2008) and United States v. Moody, 240 F. App'x 858, 859 (11th Cir. 2007), the court upheld the traffic stops because the officers had difficulty seeing into the vehicles. Defendants point out Deputy King did not articulate this same reason for the stop. (Doc. no. 79, pp. 5-6, n.2; doc. no. 80, pp. 5-6, n.2.) He did, however, testify the windows appeared to be darker than the general legal limit, and this personal observation of the window tint was sufficient to justify the traffic stop. Andrews, 2018 WL 1786996, at *5. Defendants also cite Longoria, in which the court held the officer's mistake of fact was unreasonable because he believed the tint was illegal when it was, in fact, thirteen percent lighter than the limit. Longoria, 183 F. Supp. 3d at 1175-77. The opposite is true here,

15

where the van windows were ten percent darker than the general legal limit.

### III.   CONCLUSION

For these reasons, the Court **REPORTS** and **RECOMMENDS** Defendants' motions to suppress, (doc. nos. 64, 65), be **DENIED.**

SO REPORTED and RECOMMENDED this 14th day of September, 2018, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA